## UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| CARLOS A. PARALITICCI DBA FARMACIA CONCORDIA, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>PFIZER, INC., WARNER-LAMBERT COMPANY, WARNER-LAMBERT COMPANY, LLC, and RANBAXY, INC.,<br><br>Defendants | Civil Action No. _____<br><br>**JURY TRIAL DEMANDED**<br><br>**CLASS ACTION COMPLAINT** |

Plaintiff, on behalf of itself and all others similarly situated bring this antitrust action under sections 2, 4, 12, and 13A of Act No. 77 of June 25, 1964, 10 L.P.R.A. §§258, 260, 268, and 269a; section 16 of the Clayton Act, 15 U.S.C. §26; and sections 1 and 2 of the Sherman Act, 15 U.S.C. §§1 and 2.  Plaintiff, demanding a trial by jury, alleges as follows:

## I.
## INTRODUCTION

1.      Pfizer is the largest pharmaceutical company in the world.  It is the largest biopharmaceutical company in the four global markets – the United States, the European Union, Japan, and Latin America.   It is also the largest U.S.-headquartered biopharmaceutical company in what Pfizer describes as the "Emerging Markets" of Asia, the Middle East, Africa, central and eastern Europe, Russia, Turkey, and South Korea.

2.      Lipitor is a drug used to treat high cholesterol, containing atorvastatin calcium as its active ingredient. Lipitor was purchased by Pfizer as part of its acquisition of Warner-Lambert in 2000, to prevent Lipitor from going to a competitor.

3.      Lipitor is the best-selling drug in the history of the pharmaceutical business.

4.      Lipitor sales under Pfizer's regime were and are over $13 billion per year worldwide, more than $1 billion per month.  Of Pfizer's total annual revenue from Lipitor, $7 billion per year was from U.S. sales alone.  Sixteen million Americans take Lipitor every day.

5.      Lipitor has constituted 25%-30% of the total revenues of Pfizer since 2006 or earlier.  For several years, Pfizer has enjoyed billions of dollars in revenue and profits from the prescription drug Lipitor.

6.      The main patent on the active ingredient in Lipitor (atorvastatin) expired on March 24, 2010.

7.      The enantimer patent on a particular form of the Lipitor molecule was set to expire on June 28, 2011, but was invalidated by the Court of Appeals in 2006 and not reissued until January 2009.

8.      In 2003, Ranbaxy, the largest pharmaceutical company in India, developed a generic of Lipitor.  In order to sell their generic in the United States in competition with Lipitor, Ranbaxy challenged the validity of the Lipitor patents.

9.      Because of Ranbaxy's early challenge of the Lipitor patents under the 1984 Hatch-Waxman law, Ranbaxy gained the exclusive right to sell its generic and preclude all of the Lipitor patents.  The expiration of the Lipitor patents and generics' entry would impact 30% of Pfizer's business and substantially decrease Pfizer's revenue.

10.      In July 2006, Jeffrey Kindler became Chief Executive Officer of Pfizer.

11.      In December 2006, Jeffrey Kindler became Chairman of the Board of Pfizer.

12.      In June 2008, Pfizer's common stock dropped in value by 32%, the lowest it had been in the last decade due to investors' concerns over the expiration of the Lipitor

patents.  The expiration of the Lipitor patents and generics' entry into the market would impact 30% of Pfizer's business and substantially decrease Pfizer's revenue.

13.     Facing a dramatic reduction in future revenue with the loss of exclusivity of Lipitor, Pfizer entered into an unlawful agreement with Ranbaxy to delay the entry of generic versions of Lipitor into the U.S. market for up to 20 months after its patents had expired.

14.     The fundamental terms of this agreement were that Ranbaxy would not enter the U.S. market with its Lipitor generic until November 2011; and that, at that time, and during the six months of its exclusivity as a generic to Lipitor, would price the generic at or slightly lower than the price charged by Pfizer for Lipitor.  Furthermore, Ranbaxy agreed to remain in the bottleneck, preventing other generics from entering the U.S. market until the summer or later of 2012.  In return, Ranbaxy was authorized to sell generic Lipitor in seven other countries – Australia, Canada, Belgium, Germany, Italy, the Netherlands, and Sweden – before the Lipitor-related patents' expiration.  Pfizer also agreed to drop its challenge to Ranbaxy's current sale of a generic Lipitor in Brunei, Malaysia, Peru, and Vietnam.

15.     It is that agreement and that delay in the entry of generic versions of Lipitor into the U.S. market that are the source of the anticompetitive behavior alleged herein.

## II.
## PARTIES

16.     Plaintiff Carlos A. Paraliticci, DBA Farmacia Concordia ("Plaintiff"), is a retail pharmacy, located at Calle Napoles #586, Urb Villa Capri, San Juan, Puerto Rico 00924.  Plaintiff purchased Lipitor indirectly during the class period and has been injured in its business or property by having paid more for the drugs purchased than it would have paid in absence of Defendants' violations.

17.     Defendant Pfizer, Inc. is a corporation organized and existing under the laws of the State of Delaware and has a place of business at 235 East 42nd Street, New York, New York 10017.

18.     Defendant Warner-Lambert Company is a corporation formerly organized under the laws of the State of Delaware with offices at 235 East 42nd Street, New York, New York 10017.   Warner-Lambert Company has been the owner of record of the relevant patents covering Lipitor since their issuance.

19.     Defendant Warner-Lambert Company became a wholly owned subsidiary of Pfizer, Inc. effective June 19, 2000.

20.     Defendant Warner-Lambert Company was converted into Warner-Lambert Company, LLC, a Delaware limited liability company by certificate dated December 31, 2002.   Warner-Lambert Company has offices located at 235 East 42nd Street, New York, New York 10017.

21.     Defendant Ranbaxy, Inc. is a corporation organized and existing under the laws of the State of Delaware, and has a place of business located at 600 College Road East, Princeton, New Jersey 08540.

22.     Upon information and belief, Defendant Ranbaxy, Inc. was formerly known as Ranbaxy Pharmaceuticals, Inc.

23.     Upon information and belief, Defendant Ranbaxy, Inc. is a wholly-owned subsidiary of Ranbaxy Laboratories, a corporation organized and existing under the laws of India.

24.     Certain individuals, firms, and corporations made statements and performed acts in furtherance of the conspiracy herein alleged and are named herein co-conspirators, including David Reid, Pfizer's then acting general counsel, Jeffrey Kindler, former general counsel and CEO of Pfizer, and Malvinder Mohan Singh, former CEO of Ranbaxy.

## III.
## CLASS ACTION ALLEGATIONS

25.     Plaintiff brings this action on behalf of itself and, under Rule 23 of the

Federal Rules of Civil Procedure, as representative of a class defined as follows:

> All persons or entities in the United States and its territories who
> purchased Lipitor indirectly at any time during the Class Period of March
> 24, 2010 until the effects of Defendants' conduct ceases (the "Class").
> Excluded from the Class are Defendants and their officers, directors,
> management and employees, predecessors, subsidiaries and affiliates, and
> all federal governmental entities.

26.     Members of the Class are so numerous that joinder is impracticable.

While the exact number of Class members is unknown to Plaintiff, it is believed to be at

least in the hundreds.  Furthermore, the Class is readily identifiable from information and

records in the possession of Defendants.

27.     Plaintiff's claims are typical of the members of the Class.  Plaintiff and all

members of the Class were damaged by the same wrongful conduct by the Defendants –

*i.e.*, they have paid artificially inflated prices for atorvastatin calcium and were deprived

of the benefits of competition from cheaper generic versions of Lipitor as a result of

Defendants' wrongful conduct.

28.     Plaintiff will fairly and adequately protect and represent the interests of

the Class.  Plaintiff's interests are coincident with, and not antagonistic to, those of the

Class.

29.     Plaintiff is represented by counsel who are experienced and competent in

the prosecution of class action antitrust litigation, particularly class action antitrust

litigation in the healthcare industry.

30.     Questions of law and fact common to the members of the Class

predominate over questions, if any, that may affect only individual Class members

because the Defendants have acted on grounds generally applicable to the entire Class.

Such generally applicable questions are inherent in Defendants' wrongful conduct.

31.     Questions of law and fact common to the Class include:

a.     whether the conduct alleged herein constitutes a violation of the antitrust laws;

b.     whether a relevant market needs to be defined in this case in light of the existence of direct evidence of Pfizer's power to exclude generic competition and supra-competitive prices for atorvastatin calcium;

c.     if a relevant market needs to be defined, the definition of the relevant market for analyzing Pfizer's monopoly power, and whether Pfizer had monopoly power in the relevant market;

d.     whether Defendants' actions illegally maintained Defendants' monopoly power in the relevant market;

e.     whether the activities of Defendants have substantially affected interstate commerce; and

f.     whether, and to what extent, Defendants' conduct caused antitrust injury to the business or property of indirect purchaser customers and, if so, the appropriate measure of damages.

32.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress on claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

33.     Plaintiff knows of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

### IV.
### JURISDICTION, VENUE, AND COMMERCE

34.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§1331, 1332(d), 1337(a), and 15 U.S.C. §26.

35.     Defendants named herein are found or transact business within this judicial district, and the interstate trade and commerce, hereinafter described is carried out, in substantial part, in this district.  Venue is proper in this District pursuant to 15 U.S.C. §22 and 28 U.S.C. §1391(b) and (c).

36.     At all material times, Lipitor, manufactured and sold by Pfizer, was shipped across state lines and sold to customers located outside its state of manufacture.

37.     During the relevant time period, in connection with the purchase and sale of Lipitor, monies as well as contracts, bills, and other forms of business communication and transactions were transmitted in a continuous and uninterrupted flow across state lines.

38.     During the relevant time period, various devices were used to effectuate the illegal acts alleged herein, including the United States mail, interstate, and foreign travel, and interstate and foreign telephone commerce.  The activities of Defendants, as charged in this Complaint were within the flow of, and have substantially affected, interstate commerce.

### V.
### FACTUAL ALLEGATIONS

**A.     Statutory Framework for Entry of Generic Drugs**

39.     A generic drug is a pharmaceutical product that is the bioequivalent to a brand-name drug in terms of dosage, form, strength, route of administration, quality, performance characteristics, and intended use.  Where a generic drug is completely

equivalent to a pioneer or brand-name drug, the Food and Drug Administration ("FDA") assigns the generic drug an "AB" rating.

40.　　A generic drug is typically sold at a substantial discount from the brand-name drug's price.

41.　　Lipitor is a branded drug that is available in the United States only by prescription written by a physician.  When a prescription is written for a brand-name drug such as Lipitor, a pharmacist can fill the prescription only by dispensing either the brand-name drug or its AB-rated generic equivalent.

42.　　Under most insurance plans, a pharmacist will substitute an AB-rated generic version of a prescribed brand-name drug, when available, unless the physician has indicated "DAW" or "dispense as written" on the prescription.

43.　　The entry of a generic drug into the market significantly lowers the costs of the drug, by as much as 90% in the first year.  The manufacturer of the brand-name drug will typically suffer a substantial decline in its market share immediately after generic alternatives are made available to purchasers.

44.　　The facts in this case arise in the context of the Drug Price Competition and Patent Term Restoration Act of 1984 ("Hatch-Waxman Act" or the "Act"), Pub. L. No. 98-417, 98 Stat. 1585.  The Act establishes procedures designed to facilitate the entry of lower-priced generic versions of existing, brand-name drugs while maintaining incentives to invest in new drug development.

45.　　Firms seeking approval from the FDA to market new drugs have long been required to file a New Drug Application ("NDA") demonstrating the safety and efficacy of a new product.  21 U.S.C. § 355(b).

46.　　Under the Hatch-Waxman Act, the NDA must list with the FDA any patent that might reasonably be asserted against the unauthorized manufacture, sale, or use of the drug.  21 U.S.C. §355(b)(1).

47.     A firm seeking to market a generic version of an approved drug may file an Abbreviated New Drug Application ("ANDA") demonstrating that its product is bioequivalent to the brand-name counterpart, 21 U.S.C. §355(j), without independently demonstrating safety and efficacy.

48.     If the branded drug that is brought into question by the generic version is subject to one or more listed patents, the FDA cannot approve an ANDA before the patent(s)' expiration, unless the generic applicant files a "Paragraph IV certification," through which it certifies that the patent in question is either invalid or the generic product does not infringe it.  21 U.S.C. §355(j)(2)(A)(vii)(IV).

49.     The Act makes the filing of a Paragraph IV certification an "artificial act of infringement."  35 U.S.C. §271(e)(1)-(2).

50.     The Act also requires the ANDA applicant to notify the patent owner and NDA applicant thereto of this patent challenge.  21 U.S.C. §355(j)(2)(B).

51.     Thus, a generic drug firm that files a Paragraph IV certification may be sued for infringement well before it has undertaken activities to market the generic drug.

52.     If the branded drug manufacturer files a patent infringement suit within 45 days of receiving a Paragraph IV certification, FDA approval of the generic drug maker's ANDA application is automatically stayed until the earlier of (1) the expiration of the relevant patent, (2) 30 months from the date of the Paragraph IV certification, or (3) there is a judicial determination that the patent in question is invalid or not infringed.  21 U.S.C. §355(j)(5)(B)(iii).

53.     In turn, the Act encourages the challenge to branded drug patents and/or to design around them, by granting the first Paragraph IV certified ANDA filer a l80-day period to exclusively market the generic version of the drug, during which the FDA may not grant final approval to any other generic drug manufacturer's ANDA for the same brand-name drug.  This "180-day exclusivity period" does not begin to run until either

the first ANDA applicant enters the market with its generic equivalent, or a court enters a final judgment that the patent(s) subject to the Paragraph IV certification are invalid or not infringed.

54.     The introduction of a generic drug, thus, is an event with unique and dramatic economic consequences for purchasers because generics are significantly lower-priced bio-equivalents of branded drugs.

55.     The practical consequences of generic drug economics create a substantial competitive threat and a motive for the manufacturer of the branded drug to settle its patent infringement suit with the Paragraph IV certification filer.

56.     The branded firm faced with competition from a generic firm's Paragraph IV certification runs the risk that pursuing infringement litigation to a conclusion will result in a determination that its patent is invalid or that the generic (and those that follow after the 180 exclusivity period) does not infringe any of the patents covering its branded drug.

57.     Moreover, because it is unlikely to recover damages (the requirement to file said infringement suit within 45 days means the Paragraph IV generic will not have even entered the market by the time the suit is filed), the branded drug maker has little to gain from a litigated judgment in its favor if it can protect the lucrative status quo by settlement.  And, although an unfavorable judgment as to patent validity will prevent the branded firm from excluding any future challenger, a favorable judgment will not preclude other would-be entrants from later challenging the patent.

58.     Thus, there exists anti-competitive dynamics encouraging the execution of agreements that preserve patent monopolies that are undeserved, and that harm purchasers by denying them access to significantly-lower priced generic drugs that are the bioequivalent of the branded drugs.

      **B.**     **The Patents Related to Lipitor**

59.     Pfizer owns two principal patents covering Lipitor, U.S. Patent No. 4,681,893 ("the '893 patent"), covering the active ingredient in Lipitor, atorvastatin calcium, and U.S. Patent No. 5,273,995 ("the '955 patent"), covering the particular form of the Lipitor molecule (collectively "the Lipitor-related patents").

60.     The '893 patent covering the active ingredient in Lipitor was set to expire and did expire on March 24, 2010.

61.     The '995 patent covering the particular form of the Lipitor molecule was set to expire on June 28, 2011.

62.     The former Chairman and CEO of Defendant Pfizer stated, "There are dozens of generic drug manufacturing companies with a red circle around June 28, 2011. That's the day the patent for our anti-cholesterol medication Lipitor expires."

63.     The former Chairman and CEO of Defendant Pfizer recognized that "[s]hortly thereafter a number of generic alternatives to Lipitor will be introduced and consumers will have a choice of generic tablets containing Atorvasticin calcium, the active ingredient of Lipitor."

64.     The former Chairman and CEO of Defendant Pfizer further stated, "Pfizer can expect in the following year to lose 90% of revenue from that drug as the market switches [to] generic versions."

65.     Such a result is precisely what Congress envisioned and encouraged to occur when it passed the Hatch-Waxman Act: to reduce the price of branded drugs by introducing competition from generic equivalents and thereby substantially reduce the price to purchasers.

66.     In 2002, Defendant Ranbaxy challenged Pfizer's Lipitor-related patents by being the first to file a Paragraph IV ANDA application with the FDA, ADNA No. 76-477, and announcing its intention at that time to produce a generic version of the drug at the expiration of Pfizer's Lipitor-related patents.  As a result, Ranbaxy has the ability to

sell the generic version of Lipitor exclusively for the 180-day exclusivity period beginning from the date the Lipitor-related patents expire or are declared invalid before any other generic drug maker can enter the market.

### C.    Pfizer's Lawsuits Against Ranbaxy

67.    Pfizer filed four complaints against Ranbaxy, alleging that Ranbaxy's proposed generic version of Lipitor infringed Pfizer's Lipitor-related patents.

68.    In 2005, the district court found, after a bench trial, that Ranbaxy's proposed generic would infringe both of Pfizer's Lipitor-related patents.

69.    In 2006, the Federal Circuit affirmed the district court's finding that Ranbaxy's proposed generic would infringe Pfizer's '893 ingredient patent, but reversed the court's findings with respect to the '995 form patent.

70.    As a result of the Federal Circuit's decision, Pfizer's form patent protection over Lipitor was shortened from June 28, 2011, (derived from the now declared invalid '955 patent) to that covered by the '893 ingredient patent – March 24, 2010.

71.    Thereafter in January, 2007, Pfizer filed a reissue application with the Patent and Trademark Office ("PTO"), seeking to amend the '995 patent to correct the technical defects found by the Federal Circuit.

72.    In May, 2007, Ranbaxy filed a protest with the PTO against Pfizer's reissue application.

73.    In August, 2007, the PTO issued a First Office Action rejecting Pfizer's reissue application on the grounds set forth in Ranbaxy's protest that certain claims in the '955 patent were anticipated, obvious, or constituted double-patenting.

74.    Pfizer then filed a response to the PTO's initial Office Action, which was also rejected by the PTO in April 2008.

75.     Consequently, Ranbaxy proposed to enter the market with its generic immediately after March 24, 2010.

76.     Pfizer immediately sought out its generic competitor for the purpose of keeping the generic off the market in the United States.

**D.     The Agreement**

77.     On June 18, 2008, Pfizer announced it had entered into an agreement with Ranbaxy.

78.     At this time, Daiichi Sankyo, a new potential purchaser of a substantial part of Ranbaxy, more than $3 billion, advised Ranbaxy that it would not make that purchase unless Ranbaxy entered into the unlawful agreement with Pfizer to divide markets.

79.     In 2008, Pfizer and Ranbaxy entered into an Agreement wherein they agreed to divide markets, fix prices on Lipitor and the Lipitor generic, keeping the generic off the market, and artificially extending the patent beyond its time.

80.     As part of the agreement, Pfizer granted licenses to Ranbaxy authorizing the company to sell generic Lipitor in seven other important pharmaceutical markets – Australia, Canada, Belgium, Germany, Italy, the Netherlands, and Sweden – from two to four months before the key Lipitor-related patents expired there.  Pfizer also dropped its challenge to Ranbaxy's current sale of a generic Lipitor in four other countries – Brunei, Malaysia, Peru, and Vietnam – allowing those sales to continue.

81.     As part of the agreement, Ranbaxy was granted the right to start selling copies of '995 patent then pending before the PTO and would not market any generic competitor for challenges to the validity of the Lipitor-related patents, including the reissue application for the Caduet, a Pfizer pill that combines Lipitor and the off-patent Pfizer blood pressure drug Norvasc.

82.     In return, the agreement provided that Ranbaxy would refrain from any further challenges to the validity of the Lipitor-related patents, including the reissue application for the '995 patent then pending before the PTO, and would not market any generic competitor for Lipitor in the United States until November 30, 2011 – 20 months after the then sale principal and valid patent on Lipitor (the '893 patent) would have expired and Ranbaxy would have otherwise been able to sell its generic.

83.     As a consequence of the agreement, in January, 2009, the PTO without any objection by Ranbaxy, issued a Notice of Allowance accepting Pfizer's application in the '955 patent and reissuing the same, thereby moving the expiration date for patent protection over Lipitor back to June 28, 2011.

84.     By delaying Ranbaxy's generic version of Lipitor in the United States – which would have been lawfully sold as early as March 24, 2010 – Pfizer obtained extra time for the exclusive sales of Lipitor, totaling extra sales of Lipitor of approximately $18 billion, which it would not have sold in the absence of the unlawful agreement with Ranbaxy.  In return, Ranbaxy will be able to distribute a generic substitute for Lipitor earlier in foreign markets than it otherwise would have been able to do, reaping substantial profits it otherwise would not have gained.

85.     The agreement by Defendants denies purchasers' access to a generic substitute to for Lipitor.  Lipitor's current price exceeds $4 a day, while a generic version will sell for between $0.25-$0.35, and even as low as $0.10.

86.     By reason of these unlawful agreements, the generic competition to Lipitor has been eliminated in the United States market with the result that the prices for Lipitor are 1200% or 12 times higher than they should be and would be since March 2010.

87.     In 2009, Pfizer had annual revenues of $50 billion, net income of $8.6 billion, working capital of $24 billion, assets of $212 billion, and stockholder equity of $90 billion, with 116,500 employees around the world.

88.     In 2007, 2008, 2009, and to the extent reported for 2010, Lipitor accounted for at least 23% of all market products by Pfizer.

89.     In 2009, after the Agreement with Ranbaxy but before the implementation of that agreement, Lipitor accounted for 29-30% of total bio-pharmaceutical products produced by Pfizer and total revenue produced by Pfizer.

90.     By delaying entry of Ranbaxy's generic version of Lipitor, which would have been sold as early as March 2010, Pfizer obtained extra time for the exclusive sales of Lipitor, totaling billions of additional dollars.

91.     Ranbaxy launched Lipitor generic in the U.S. market in November 2011, risk free with 180-day exclusivity and an agreement with Pfizer that it will price its generic at or slightly less than the Pfizer price.

92.     The agreement between Defendants artificially extended the length of the Lipitor-related patents, allocated markets between them, artificially postponed price reductions, and restrained trade in the provision of Lipitor and its generic alternatives.

93.     The agreement between Pfizer and Ranbaxy is an agreement to divide markets in that Ranbaxy agreed that it would not sell its generic in the United States until November 2011 in exchange for being able to sell in other countries.

94.     The agreement between Pfizer and Ranbaxy is an agreement to fix prices in that Pfizer would be able to charge 12 times more for Lipitor than it otherwise would be in the absence of the unlawful agreement.

95.     The agreement between Pfizer and Ranbaxy is a combination to monopolize and attempt to monopolize, and monopolization in that the agreement

unlawfully extends the time period of the Lipitor patents, excludes competition from other generics, and fixes prices.

96.      Generic pharmaceutical analysts have publicly stated that such an agreement clearly was not envisioned by the Hatch-Waxman Act.

97.      The agreement meant that purchasers would continue to pay branded pharmaceutical prices for Lipitor longer than necessary.

## VI.
## RELEVANT MARKET

98.      Direct proof exist that Pfizer had monopoly power over the price of atorvastatin calcium.  Such direct evidence will include, *inter alia*, (1) manufacturers' and/or market-wide transactional data that will show a significant, non-transitory decline in atorvastatin calcium prices upon entry of generic atorvastatin calcium that had not occurred until generic entry, and (2) abnormally high price-cost margins enjoyed by Pfizer prior to the entry of generic competition.  This direct evidence of monopoly power obviates the need to define a relevant product market in assessing whether Pfizer had monopoly power.

99.      Assuming, *arguendo*, that a relevant market needs to be defined, the relevant product market is all atorvastatin calcium products – *i.e.*, Lipitor (in all its forms and dosage strengths) and bioequivalent atorvastatin calcium products.  The relevant geographic market is the United States and its territories.  A firm that was the only seller of such products in the United States could and would impose a significant, non-transitory price increase without losing sufficient sales to render the price increase unprofitable, as demonstrated by Pfizer's ability to profitably charge supra-competitive prices during the period in which it lacked generic competition.  There are no reasonably interchangeable drug products that are available to prescribing physicians for the indications for which atorvastatin calcium is prescribed.

100.     Through the anticompetitive conduct alleged herein, Defendants were able to profitably charge supra-competitive prices for atorvastatin calcium without losing substantial sales, and thus, by definition, maintained monopoly power with respect to atorvastatin calcium sold in the United States.

101.     Pfizer's market share in the relevant market is 100%.

## VII.
## FIRST CAUSE OF ACTION
## VIOLATION OF SECTION 2 OF THE SHERMAN ACT
## (15 U.S.C. §2)

102.     Plaintiff incorporates and realleges all paragraphs in this Complaint, as though fully set forth below.

103.     Defendants unreasonably and unlawfully restrained and monopolized trade and attempted to monopolize trade with specific intent in violation of Section 2 of the Sherman Act.  Pfizer did, in fact, monopolize trade in the United States in the market for atorvastatin calcium and eliminated competition in the sale of Lipitor and its generic equivalents in the United States.

104.     During the period covered by this Complaint and thereafter, Plaintiff and the Class purchased Lipitor and will continue to purchase Lipitor, and by reason of the alleged violation of the antitrust laws, Plaintiff paid more and will pay more for these drugs than it would have paid in the absence of Defendants' conduct.  As a proximate result cause thereof, Plaintiff has been injured and will continue to be injured in its business and property and has suffered damages in an amount according to proof at trial.

## VIII.
## SECOND CAUSE OF ACTION
## VIOLATION OF SECTION 1 OF THE SHERMAN ACT
## (15 U.S.C. §1)

105.     Plaintiff incorporates and realleges all paragraphs in this Complaint, as though fully set forth below.

106.     Beginning in or about March of 2008, Pfizer and Ranbaxy engaged in a continuing illegal contract, combined, and conspiracy in restraint of trade, the purpose and effect of which was to: (1) allocate all sales of atorvastatin calcium in the United States to Pfizer; (2) prevent the sale of a generic version of atorvastatin calcium in the United States until at least November 30, 2011, thereby protecting Lipitor from any generic competition for up to 20 months; and (3) fix the price at which Plaintiff and the Class would pay for Lipitor at the higher, branded price.

107.     By entering into these unlawful conspiracies, Defendants have unlawfully conspired in restraint of trade and committed a violation of section 1 of the Sherman Act. Defendants' agreements are horizontal market allocation and price fixing agreements between actual or potential competitors and thus are *per se* violations of section 1.  In the alternative, Defendants' agreements are unreasonable restraints of trade under a "quick look" or "rule of reason" mode of analysis.

108.     Plaintiff and the Class have been injured in their business and property by reason of Defendants' unlawful contract, combination, and conspiracy.  Plaintiff and the Class have paid more on their purchases of Lipitor than they would have paid absent Defendants' illegal conduct, and/or were prevented from substituting a cheaper generic alternative for their purchases of the more expensive Lipitor.

109.     As a result of Defendants' illegal conduct, Plaintiff and the Class paid more than they would have paid for atorvastatin calcium, absent Defendants' illegal conduct.  But for Defendants' illegal conduct, competitors would have begun marketing generic versions of atorvastatin calcium well before November 30, 2011, and/or would have been able to market such versions more successfully.

110.     If manufacturers of generic atorvastatin calcium entered the market and competed with Lipitor in a full and timely fashion, Plaintiff and the Class would have substituted lower-priced generic atorvastatin calcium for the higher-priced brand name

Lipitor for some or all of their atorvastatin calcium requirements, and/or would have paid lower prices on some or all of their remaining Lipitor purchases.

111.     During the relevant period, Plaintiff and the Class purchased substantial amounts of Lipitor directly from Pfizer.  As a result of Pfizer's illegal conduct, alleged herein, Plaintiff and the Class were compelled to pay, and did pay, artificially inflated prices for their atorvastatin calcium requirements.  Plaintiff and the Class paid prices for atorvastatin calcium that were substantially greater than the prices they would have paid absent the illegal conduct alleged herein because: (1) Class members were deprived of the opportunity to purchase lower-priced generic atorvastatin calcium instead of expensive brand name Lipitor; (2) Class members were forced to pay artificially inflated prices for generic atorvastatin calcium; and/or (3) the price of brand name Lipitor was artificially inflated by Defendants' illegal conduct.

### IX.
### THIRD CAUSE OF ACTION
### VIOLATION OF SECTION 4 OF ACT NO. 77 OF JUNE 25, 1964
### (10 L.P.R.A. §260)

112.     Plaintiff incorporates and realleges all paragraphs in this Complaint, as though fully set forth below.

113.     Defendants unreasonably and unlawfully restrained and monopolized trade and attempted to monopolize trade with specific intent in violation of Section 4 of Act No. 77 of June 25, 1964.  Pfizer did, in fact, monopolize trade in the United States in the market for atorvastatin calcium and eliminated competition in the sale of Lipitor and its generic equivalents in the United States.

114.     During the period covered by this Complaint and thereafter, Plaintiff and the Class purchased Lipitor and will continue to purchase Lipitor, and by reason of the alleged violation of the antitrust laws, Plaintiff paid more and will pay more for these drugs than it would have paid in the absence of Defendants' conduct.  As a proximate

result cause thereof, Plaintiff has been injured and will continue to be injured in its business and property and has suffered damages in an amount according to proof at trial.

## X.
## FOURTH CAUSE OF ACTION
## VIOLATION OF SECTION 2 OF ACT NO. 77 OF JUNE 25, 1964
## (10 L.P.R.A. §258)

115.     Plaintiff incorporates and realleges all paragraphs in this Complaint, as though fully set forth below.

116.     Beginning in or about March of 2008, Pfizer and Ranbaxy engaged in a continuing illegal contract, combined, and conspiracy in restraint of trade, the purpose and effect of which was to: (1) allocate all sales of atorvastatin calcium in the United States to Pfizer; (2) prevent the sale of a generic version of atorvastatin calcium in the United States until at least November 30, 2011, thereby protecting Lipitor from any generic competition for up to 20 months; and (3) fix the price at which Plaintiff and the Class would pay for Lipitor at the higher, branded price.

117.     By entering into these unlawful conspiracies, Defendants have unlawfully conspired in restraint of trade and committed a violation of Section 2 of Act No. 77 of June 25, 1964.  Defendants' agreements are horizontal market allocation and price fixing agreements between actual or potential competitors and thus are *per se* violations of section 1.  In the alternative, Defendants' agreements are unreasonable restraints of trade under a "quick look" or "rule of reason" mode of analysis.

118.     Plaintiff and the Class have been injured in their business and property by reason of Defendants' unlawful contract, combination, and conspiracy.  Plaintiff and the Class have paid more on their purchases of Lipitor than they would have paid absent Defendants' illegal conduct, and/or were prevented from substituting a cheaper generic alternative for their purchases of the more expensive Lipitor.

119.     As a result of Defendants' illegal conduct, Plaintiff and the Class paid more than they would have paid for atorvastatin calcium, absent Defendants' illegal conduct.  But for Defendants' illegal conduct, competitors would have begun marketing generic versions of atorvastatin calcium well before November 30, 2011, and/or would have been able to market such versions more successfully.

120.     If manufacturers of generic atorvastatin calcium entered the market and competed with Lipitor in a full and timely fashion, Plaintiff and the Class would have substituted lower-priced generic atorvastatin calcium for the higher-priced brand name Lipitor for some or all of their atorvastatin calcium requirements, and/or would have paid lower prices on some or all of their remaining Lipitor purchases.

121.     During the relevant period, Plaintiff and the Class purchased substantial amounts of Lipitor directly from Pfizer.  As a result of Pfizer's illegal conduct, alleged herein, Plaintiff and the Class were compelled to pay, and did pay, artificially inflated prices for their atorvastatin calcium requirements.  Plaintiff and the Class paid prices for atorvastatin calcium that were substantially greater than the prices they would have paid absent the illegal conduct alleged herein because: (1) Class members were deprived of the opportunity to purchase lower-priced generic atorvastatin calcium instead of expensive brand name Lipitor; (2) Class members were forced to pay artificially inflated prices for generic atorvastatin calcium; and/or (3) the price of brand name Lipitor was artificially inflated by Defendants' illegal conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against all Defendants, jointly and severally, as follows:

1.     that the Court certify the Class defined in this Complaint pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) and designate Plaintiff as the representative for the Class and its counsel as counsel for the Class;

2.      that the Court adjudge and decree that the Defendants and each of them have violated sections 1 and 2 of the Sherman Antitrust Act and Sections 2 and 4 of Act No. 77 of June 25, 1964;

3.      that the Plaintiff and all others similarly situated be awarded damages suffered by reason of these violations and that those damages be trebled in accordance with law;

4.      that the Plaintiff be awarded reasonable attorneys fees and costs; and

5.      that the Court grant such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all claims asserted in this Complaint so triable.

DATED:  February 3rd, 2012                  Respectfully submitted,

LUIS E. MINAÑA & ASSOC. LLC
**DOVAL, MIÑANA & PEDROSA LAW OFFICES, PSC**


_S/ Luis E. Miñana_ USDC-PR # 225,608
LUIS E. MINAÑA, ESQ.
122 Calle Manuel Dómenech Altos
Urb. Baldrich
San Juan, PR  00918
787-758-1999
minanalaw@prtc.net

SCOTT+SCOTT LLP
CHRISTOPHER M. BURKE
707 Broadway, Suite 1000
San Diego, CA 92101
619-233-4565
cburke@scott-scott.com

*Farmacia Concordia v. Pfizer, et al.*

Page: 23

SCOTT+SCOTT LLP
JOSEPH P. GUGLIELMO
500 Fifth Avenue, 40th Floor
New York, NY 10110
212-223-6444
jguglielmo@scott-scott.com